DECISION ON REMAND
This matter was remanded to the trial court in order that certain factual issues pertaining to discovery be determined.
The victim in this case, Natalino Faria, was shot and killed at point blank range by the defendant. The defendant, a married man, observed the victim leaving a pizza restaurant with his (the defendants) girlfriend/babysitter and followed them, armed with a .357 magnum and speedloaders of ammunition. The defendant proceeded to play "chicken" with the couple, eventually forcing them to pull over, whence the deadly confrontation occurred.
Three days before the slaying, acts of vandalism were perpetrated on the defendant's property for which he held the victim responsible. The defendant reported these incidents, as well as incidents which occurred months before, to the Rehoboth Police Department. The day before the killing, the defendant became agitated upon learning that no one had been arrested after he had filed his reports. The defendant alleges that the State failed to produce at trial the November 10, 1987 police report which he characterizes as "exculpatory evidence."
It must be noted that the only "original" parties involved in the remand proceedings are Mr. L'Heureux and the Court. The present prosecuting and defense attorneys did not become involved in this case until years after the trial had been concluded.
An examination of the trial transcript reveals that the November 10, 1989 incident and the report to the police department were mentioned in defense counsel's opening statement. Clearly the defendant had knowledge of it — he himself filed it! Defense counsel also acknowledged in his opening statement that on November 12, 1989, the defendant had called the Rehoboth Police to inquire as to the status of the investigation. The defendant in his own testimony — at trial described in detail the vandalism at his property on the eve of November 10, 1989. After he completed his narration, he was asked the following questions by defense counsel:
 Q: Did you report that to the police?
 A: Yes, I did.
 Q: Did you have any suspicions who might have done that?
 A: Yes, I did.
 Q: Who did you suspect?
 A: Natalino Faria.
 Q: In fact, you told that to the police, did you not?
 A: Yes, I did.
 Q: You made a report to the police?
 A: Yes, I did. (TR240-41.)
With reference to the same incident and report, the defendant was cross-examined as follows:
 Q: So, that vandalism occurred somewhere between five thirty and seven thirty?
 A: Yes, it did. . . .
 Q: Is there any reason that you told the Rehoboth Police on that Friday night that the vandalism occurred sometime between seven fifteen and eight twenty-three?
 A: No. Maybe I was just mistaken. (TX. 275) . . .
 Q: Now, are you telling this jury that you shot Natalino Faria because he vandalized your home on Friday night?
 A: No (TR. 278) . . .
 Q: Well, why did you glance, you were terrified, why didn't you stop to look for him?
 A: Because of all the police reports I filed in the past . . . (TR. 237, emphasis supplied.)
Before addressing the testimony at the remand hearing, the court is compelled to refer to its ruling after a lengthy evidentiary hearing conducted during the defendant's motion for a new trial. The court shall incorporate by reference its reasoning in that decision. See Appended Court Transcript, beginning on page 97, line 18 and ending on page 102, line 24.
In the instant remand hearing, trial prosecutor Joshua Wall testified that he was not in the possession of any Rehoboth Police reports at the commencement of the trial. It was through prosecution witnesses that Mr. Wall learned that the defendant had reported incidents of vandalism to the police, blaming Natalino Faria. After Mr. Wall became aware — for the first time — that these reports were filed (after the trial had begun) he contacted the Rehoboth Police Department and requested that an officer bring the reports to the courthouse. The court has a distinct recollection of an officer appearing at the courtroom to deliver the documents.
That officer, Sergeant Peter Withers, testified at the remand hearing, that he appeared at the trial in 1990 with the reports. He definitely brought to the trial the vandalism reports in controversy and shared them with the attorneys. Honorable William A. Dimitri, Jr., Mr. L'Heureux's trial attorney, testified that he "obviously" knew about vandalism his client attributed to the victim. Judge Dimitri had questioned the defendant about incidents of vandalism both at defendant's residence and business and decided to use those events as part of the defense strategy. The Judge testified that he "relied on The Rehoboth police reports in forming a defense." Raising the suspicion that Natalino Faria had perpetrated the damage to defendant's property and had also stolen a .32 caliber gun from the defendant, "all went into the defense to minimize first degree murder." The Judge explained that he was in no way surprised by the "mid-trial" discovery concerning the reports of vandalism and the Natalino Faria connection. When asked if he had been aware of this material he responded: "Yes, of course, I knew."
Several of Mr. Leureux's family members also testified at the remand hearing. Mrs. Pauline L'Heureux testified that after the defendant was arrested he displayed photographs to her depicting damage to his yard, house and car, as well as tire tracks. She said that the defendant told her to "hang on" to the pictures as they were "important to the defense." The pictures remained in Mrs. L'Heureux's possession throughout the trial; the defendant never asked her to produce them.
The defendant's sister, Suzanne Baptista, testified that she first viewed the tire track photos at the Rehoboth Police Department in 1994. Two years later, at the request of the family, Mrs. Baptista returned to the department to retrieve a set of negatives. Chief Walsh allowed her to take the negatives which she had developed and forwarded to the Connecticut State Police Crime Lab for examination by Hans Stoeckler. Mr. Stoeckler and another expert witness testified that the tire imprints defendant's property were consistent with the type of tires on the victim's vehicle.
Mr. Alfred L'Heureux, defendant's father, testified that the defendant had placed photographs in the glove compartment of his (Alfred's) car. The defendant placed them there as his father drove him to La Salette Shrine where the defendant had insisted upon surrendering. The defendant said to his father, "make sure these stay in the glove compartment." Mr. L'Heureux never saw the photos and would only be "speculating" if he were to guess as to their number or content.
The defendant argued that these photos of lawn damage to the defendant's property would have been useful to the defense and were seized by the police and withheld from defendant.
It is elemental that the material in controversy was material which this defendant caused to be created. It is he who filed the police reports and he who knew that the pictures were taken. All related events were peculiarly within his knowledge. The events occurred in another state days and months before the killing. It is ludicrous to suggest that these materials were withheld by Rhode Island prosecuting attorneys.
The evidence is overwhelming and the court finds as a fact that the rules of discovery were not only complied with but exceeded.
The source of knowledge concerning the police reports was the defendant himself. To "discover" is to find out about something previously unknown. Even though this Court would not saddle the state with the burden of seeking out reports filed by defendants without the State of Rhode Island, of which the State had no knowledge, let alone possession; the Court will apply such a standard to the instant case. As soon as the prosecutor became aware of the reports, he summoned a Rehoboth police officer to the trial. Indeed, the trial was recessed until the officer arrived and the material was furnished. Of course, this material was no surprise to the defendant because the reports were his very own statements.
Nevertheless, this court is under order to make a factual finding "on the question of whether the material relating to the Rehoboth police reports was provided to the defendant as per his requests." The overwhelming, credible evidence leads incontrovertibly to one answer: a resounding "yes."
despite this death threat and despite the fact that Faria was going wild, he rolled down his own window to tell Faria to calm down. Faria then came at him and grabbed him, he testified. After he pushed Faria away, he saw Faria reach into his pocket with his right hand. Because he feared Faria had a gun, he shot him with the .357 Magnum that he had in his car at his side. In actuality, as the Court already noted, only a $5 bill was found in the victim's hand, which he died holding onto; and the left hand, as Dr. Garrity explained, was positioned in front of the victim with the back of the hand toward the defendant, not the front of the hand.
Mr. L'Heureux acknowledged that he had told witness Elaine Rooks that he was going to "— get even with Faria —" but he claimed that he said it because he was dissatisfied with how the police were treating his complaints of vandalism.
As part of his motion for new trial, the defendant also alleges a Brady violation because of the failure to disclose material evidence, to wit, the Rehoboth Police complaints and physical evidence relating to the same. He complains that the State also failed to disclose photographs memorializing the vandalism — the acts of vandalism at his place of business and also at the defendant's residence. The defendant characterizes the police reports as documentation of an escalating pattern of violence against him which generated a reasonable fear of harm.
At the evidentiary hearing, the actual reports were introduced. Exhibit B, a June 24th, 1989 report, indicates that Rehoboth Police responded to the Molotov cocktail complaint. Exhibit C, another Reboboth Police Department report, documented the vandalism on November 10th, 1989 to the defendant's property as well as the defendant's suspicion of Netalino Faria as the responsible party. In fact, an Officer Mendes, working on another case, went to check the address of Faria that the defendant had provided but could not locate Faria's vehicle. Exhibits D and E were also introduced, that would be the daily logs of the Rehoboth Police Department, and they reveal that during the twelve to eight shift on November 11th, the defendant called to complain about anonymous phone calls and requests that his mailbox be dusted for fingerprints. He called later also to request that an officer pick up a tape of his answering machine. During the eight to four shift, the police log shows that an officer did pick up the answering machine tape. There is a later entry stating report of mailbox belonging to L'Heureux found on Tremont Street near Four Corners returned to homeowner. On the morning of the 12th, Exhibit F reports that the defendant called the police to ask if the vandal who damaged his property was in custody. After he said was the person in jail yet, When he received a negative answer, he became very agitated and started yelling and stated that he couldn't live like this anymore. The only other documents presented at the hearing were the juvenile records of witness Kerry Madden. The only petitions predate the shooting and related to two charges of disobedience in 1990. There were three petitions, one for disobedience and two for damaging the cars of Patricia Bergeron, and this defendant.
According to Brady and it progeny, nondisclosed exculpatory evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. The defendant argues that this standard is met because the excluded evidence was unequivocal Tribble evidence. The Tribble case permits the introduction of evidence concerning a victim's reputation for violent behavior for the purpose off showing the reasonableness of a defendant's fear of imminent, imminent bodily harm or for the purpose of showing that the victim was the aggressor in a confrontation.
The defendant argues that because the State's theory of prosecution was that the defendant manufactured the incidents of vandalism as a protection for the ensuing murder any corroborative evidence of vandalism, such as the police reports and photographs, was relevant and material. Although the prosecutor did suggest at one point that the vandalism was a contrivance, he also invited the jury to accept the vandalism as true, noting that it was no justification for killing someone. Thus, the vandalism could hardly be characterized as central to the State's case.
With reference to the defendant's claim that his so-called exculpatory evidence was not disclosed or provided by the State, the defendant completely ignores the fact that this material was generated by him. It was he who called the police, he who gave the reports, he who knew of their existence, he who had not only equal access to procuring them but superior knowledge of what they contained. It is inconceivable to the Court that the presentation of these documentations and photographs would have any bearing whatsoever on the outcome of this case.
The last act of vandalism which the defendant intended to impute to the victim with no evidence of the victim's culpability, by the way, occurred two days before the shooting.
What is relevant and material are the events just prior to the shooting. The evidence reveals that the defendant taunted the victim in his car causing the victim to pull over, get out of his car, and go to the defendant's car. Mr. Faria was five feet six inches tall, he weighed 180 pounds, clearly not someone who's menacing or large or threatening looking. Mr. Faria, as he approached the defendant's car, was totally defenseless; and when Faria does get to the defendant's car, the defendant, who's supposed to be in such fear, does not drive away, as he has a perfect opportunity to do, he rolled down the window and grabs at the victim, then takes his gun and shoots him dead. The defendant had killed a man, in my estimation, whom he had threatened to kill. He killed a man who was with his ex-girlfriend. He killed a man who revealed his affair with his girlfriend to his wife.
The credible testimony of the eye witness. Kerry Madden, and the medical examiner and the physical evidence would have supported, in my opinion, a verdict of murder in the first degree. The defendant, with his .357 Magnum at his side, watched the agitated victim approach him and just waited for him to get to the car instead of driving away from this confrontation, which